COURT OF APPEALS

EIGHTH DISTRICT OF
TEXAS

EL PASO, TEXAS

 

 


 
 
  
  
  
 IN THE MATTER OF J.R.C.S.,
 A JUVENILE,
  
 
 
 §
  
 §
  
 §
  
 §
  
 §
  
  § 
  
 
 
  
 No. 08-11-00138-CV
  
 Appeal from the
  
 65th
 District Court 
  
 of El
 Paso County, Texas 
  
 (TC#10,00990) 
  
 
 


 

O
P I N I O N

            Appellant J.R.C.S.
(“J.R.C.S.”), a minor, appeals the Juvenile Court Referee’s Order of
Adjudication finding that J.R.C.S. engaged in delinquent conduct by committing
the offense of felony Criminal Mischief. 
He also appeals the Juvenile Court’s Disposition placing J.R.C.S. on
probation until his 18th birthday, ordering J.R.C.S. to pay restitution in the
amount of $50,000, and ordering his parents to pay $25,000 in restitution.  J.R.C.S. raises five issues:  (1) the evidence was legally insufficient to
justify the order of adjudication of delinquency; (2) error in the
determination of damages under Texas Penal Code § 28.06(a) and (b); (3) the
State failed to prove each and every point in its petition; (4) abuse of
discretion by the trial court in assessing a disposition; and (5) abuse of
discretion in ordering the juvenile’s parents to pay restitution.  For the reasons that follow, we affirm.

BACKGROUND

            The State filed a Petition Based on
Delinquent Conduct alleging that J.R.C.S. committed the offense of Criminal
Mischief causing pecuniary loss in the amount of $20,000 or more but less than
$100,000.  A trial was held on March 25
and 28, 2011.

            On July 14, 2010, the playground at
Ramona Elementary School (“Ramona”) in El Paso, Texas was set on fire,
destroying and damaging the playground equipment.  Arturo Ruiz (“Ruiz”) was working at Ramona on
the day of the fire.  When he arrived at
work that day, he noticed that the playground was undamaged.  Later, as he was working in Room 140, he saw
fire and smoke coming from the playground. 
Ruiz testified that he saw two juveniles running away from the flames
toward a park, but he did not see their faces, and did not see anyone else near
the fire.  Ruiz called 911 and then went
outside to open the gates for the fire truck.

            Belen Fonseca (“Fonseca”) testified
that she was working at Ramona on July 14, 2010 when she saw two boys playing
with a skateboard head toward the park prior to the fire.  She noticed that one of the boys had curly
green hair, but was unable to identify J.R.C.S. as the boy she saw that day.

            Gloria Cortez (“Mrs. Cortez”) testified
that on July 14, 2010 she and her family were driving home from the El Paso Zoo
when she noticed a “fire like a bonfire” on the playground at Ramona.  She then noticed two boys jogging away from
the fire.  She recognized J.R.C.S. as one
of the boys running from the fire and identified him to the jury.  She and her husband told the boys to stop and
she and her husband prevented them from leaving.  She also noticed that they had been filming
the fire with a cell phone.  While she
was at the scene, Mrs. Cortez saw the boys give the cell phone to J.R.C.S.’s
mother, and Mrs. Cortez identified her as the same woman sitting in the
courtroom with J.R.C.S.  Mrs. Cortez
identified a photograph depicting J.R.C.S. and another boy sitting on
skateboards with their backs to the camera. 
The photograph was admitted into evidence.

            Tony Cortez (“Mr. Cortez”) testified
that he, Mrs. Cortez, and their children were returning from the El Paso Zoo
when he saw a fire at the Ramona playground, and asked Mrs. Cortez to dial 911.  As he approached Ramona from North Loop
Street, he saw two boys running toward a fence. 
Mr. Cortez stopped his car, stopped the boys, then checked the playground
and found no one else present.  At trial,
Mr. Cortez identified J.R.C.S. as one of the two boys he stopped running away
from the fire.

            Eric Sodermann
(“Sodermann”), an arson investigator for the El Paso
Fire Department, testified that he investigated the playground fire at Ramona
on July 14, 2010.  He attempted to walk
around the burning area, but the melted tire material (used as ground chips for
the playground) “was in a tar-type state” and made it too difficult to
traverse.  He described the playground as
“almost a complete burn.”  He also met
with Mr. and Mrs. Cortez at the scene.  Sodermann returned to the playground two days later to
continue his investigation and to determine the origin and cause of the
fire.  Sodermann
testified that he found part of a disposable lighter.  He also looked underneath the main platform
of the playground and determined that the fire originated under the platform
because the supporting posts had melted, “telling [him][the
fire] burned hotter in that area and longer in that area, so they melted and it
collapsed.”

            On July 21, 2010, Sodermann visited J.R.C.S.’s home and met with his mother,
Norma Castro (“Ms. Castro”).  Sodermann asked her if he could have the cell phone that
was in her son’s possession.  Ms. Castro
went back into the house and returned with the cell phone, a black Samsung,
which was later entered into evidence.  Sodermann obtained a search warrant to access any
electronic data on the phone pertaining to the playground fire.  The phone was submitted to the FBI office in
El Paso.  The FBI was able to retrieve
several still photographs of a fire: the first was an image of a fire on the Ramona
playground; the second photo showed paper being added to the fire; the third
showed the fire getting bigger.  Later, Sodermann found two videos on the phone showing a fire
growing in size.  The audio portion was
translated by a court interpreter from Spanish to English for the jury.  The translation included the following: “Go,
go, go, go;” “it smells like shit, man;” “we ought to
do this when it’s cold man.  Put more
paper in it, yeah, man.”

            At trial, Sodermann
was shown several exhibits.  Exhibits One
through Eight were identified as accurate depictions
of the state of the Ramona playground as Sodermann
initially witnessed it.  Sodermann affirmed that the boy wearing the black shirt in
Exhibit 16 was J.R.C.S. and identified J.R.C.S. as one of the suspects at the
center of his investigation.  Sodermann identified the cell phone, admitted as State’s
Exhibit Seventeen, as the cell phone he obtained from J.R.C.S.’s mother which
contained photos of a fire and two videos of a fire increasing in size.  The photographs were admitted as State’s
Exhibits Eighteen through Twenty, and a DVD of the videos was admitted as
State’s Exhibit Twenty-One.  Sodermann admitted on cross-examination that the lighting of
paper does not necessarily mean that someone is trying to start a fire, and
that he did not see anything that was intended specifically to try and burn
down the playground.  He also admitted
that the structural steel posts had paint damage but were otherwise
intact.  In response to the defense’s
question “You saw no specific intent to damage this playground, did you, sir?”  Sodermann replied
“no.”

            Roberto Luna, Jr., (“Luna”) was a
maintenance supervisor for the Ysleta Independent School District (“YISD”).  He was employed as an Environmental Service
Technician for YISD at the time of the fire handling “any type of hazards that
occur[ed] in the school
district.”  Luna responded to the fire at
Ramona, but by the time he arrived the playground was completely burned.  Luna identified Exhibits One through Eight as the remains of the playground.

            Luna testified that, as part of his
job, he had become familiar with playgrounds and the structures surrounding
them, and had handled playground fires before. 
He stated that the playgrounds at all the YISD elementary schools were
similar; that the cost to replace other playgrounds was around $100,000; but
that the bid to replace the Ramona playground was $75,000.  Luna further testified that the playground
equipment is similar, but not the same, in all schools because newer equipment
would have a different model number.  Luna
testified that the entire playground could not be repaired and had to be
replaced.  Luna admitted that he did not
know how long the playground had been in place and that he did not know how
much depreciation had occurred to the playground equipment.  Luna admitted that he did not prepare the
purchase orders himself.  Instead, he prepared
the request for the purchase orders, which were then handled by the purchasing
department.  The juvenile referee took
the admission of the purchase orders under advisement, but ultimately the
purchase orders were not admitted into evidence.

            Bernice Madrid (“Madrid”), a
secretary for YISD’s Environmental Services Department, testified that as part
of her job she is responsible for the inventory and purchasing of school
equipment, and is the custodian of records. 
She processed the quotes and handled the purchase orders for the
replacement of the Ramona playground. 
She identified State’s Exhibit Eleven, a memorandum to the associate
superintendent of finance showing the replacement cost of the playground as
$75,153.04, and Exhibits Twelve through Fifteen (purchase orders for
replacement and clean-up of the playground), which were admitted into
evidence.  She testified that she had no
knowledge regarding the value or depreciation, if any, of the Ramona playground
equipment.

The
principal of Ramona Elementary School, Anna Silva, testified that Exhibits
Twenty-three and Twenty-four accurately depicted the playground before the
fire.  She also testified that she
remembered when the original playground was installed, it had slides, monkey
bars, and “was quite extensive.”  She
testified that she received a call that the playground was burning and arrived
at the school after the fire had been extinguished.  She identified J.R.C.S. as one of the
juveniles at the scene when she arrived.

            Following a two day trial, the jury
found that J.R.C.S. had engaged in delinquent conduct.  An Order of Adjudication was signed on March
28, 2011.  On April 19, 2011, a
Disposition hearing was held.

            Gabriela Salazar (“Ms. Salazar”), a
juvenile probation officer, testified at the hearing regarding the probation
department’s home study and recommendation. 
Ms. Salazar testified that, in her opinion, J.R.C.S.’s parents had not
contributed to his delinquency.  She
further testified that, other than the adjudicated offense, J.R.C.S. was not in
need of rehabilitation.  However, she
later testified that he was in need of rehabilitation to deal with his “poor
judgment and the adjudicated offense.” 
Ms. Salazar stated that she did not know anything specific about the
offense and was unaware of the video admitted during the trial.  Ms. Salazar testified that:  (1) J.R.C.S. lived with his family and
siblings in the El Paso’s lower valley; (2) his parents reported that they do
not encounter any behavior problems with him; (3) his parents could provide the
proper control and supervision for him; and (4) he was attending high school
and doing well.  She stated that because
of the adjudicated offense, she thought counseling was necessary.  Ms. Salazar then testified that J.R.C.S. was
in need of rehabilitation because “he needs to be held accountable” for his
offense.  She stated that the Positive
Achievement Change Tool (“PACT”) assessment she prepared showed J.R.C.S. at a
low risk to reoffend and that only four of the eighteen areas showed risk
factors.

The
court found J.R.C.S. in need of rehabilitation and that the protection of the
public and the juvenile required a disposition.

Following
the Disposition hearing, the juvenile referee placed J.R.C.S. on probation
until his 18th birthday; ordered J.R.C.S. to pay restitution in the amount of
$50,000; and ordered his parents to pay restitution in the amount of $25,000.  J.R.C.S. timely appealed.

DISCUSSION

            J.R.C.S.
brings five issues:  (1) the evidence was
legally insufficient to justify the order of adjudication of delinquency; (2)
error in the determination of damages under Texas Penal Code § 28.06(a)
and (b); (3) the State failed to prove each and every point in its petition;
(4) abuse of discretion by the trial court in assessing a disposition; and (5)
abuse of discretion in ordering the juvenile’s parents to pay restitution.  J.R.C.S. asserts that his first three issues
are related and argues them as one issue, and similarly groups Issues Four and Five.

Adjudication of Delinquency

            J.R.C.S.
contends that the evidence was legally insufficient to justify the order of
adjudication of delinquency.  He argues
that the State presented: no testimony showing the fair market value (“FMV”) of
the destroyed playground equipment; no testimony as to why FMV could not be
used for the damage calculation; and the evidence made no distinction made
between equipment that was “destroyed” versus “damaged.”  Finally he asserts that the State’s petition
listed specific playground equipment, but no evidence was presented that the Ramona
playground included the listed equipment and that those pieces were replaced or
repaired.

Standard of Review

Although juvenile
appeals are categorized as civil cases, we use the same standards applicable in
criminal appeals when reviewing challenges to the sufficiency of the evidence
supporting a finding that a juvenile engaged in delinquent conduct.  See In
re D.R.T., 339 S.W.3d 208, 209 (Tex.App.--El Paso
2011, no pet.); In re H.G.G.D., 310
S.W.3d 43, 45 (Tex.App.--El Paso 2010, no pet.);
In re M.D.T., 153 S.W.3d 285, 287 (Tex.App.--El Paso 2004, no pet.).  The legal-sufficiency standard is the only
standard a reviewing court should apply in determining whether the evidence is
sufficient to support each element of a criminal offense that the State is
required to prove beyond a reasonable doubt. 
See Brooks v. State, 323
S.W.3d 893, 895 (Tex.Crim.App. 2010); see also Jackson v. Virginia, 443 U.S.
307, 318-19, 99 S.Ct. 2781, 2788-89, 61 L.Ed.2d 560
(1979).  Accordingly, we review the
evidence under the Jackson standard.  See
D.R.T., 339 S.W.3d at 210. 

Under Jackson, we review “the evidence in the
light most favorable to the prosecution” to determine whether “any rational
trier of fact could have found the essential elements of the crime beyond a
reasonable doubt.”  Jackson, 443 U.S. at 319, 99 S.Ct. 2789.  This standard gives full play to the
responsibility of the trier of fact in resolving conflicts in testimony,
weighing the evidence, and drawing reasonable inferences from basic to ultimate
facts.  Jackson, 443 U.S. at 319, 99 S.Ct. 2789.  As a reviewing court, we do not resolve any
conflicts of fact or re-evaluate the weight and credibility of the evidence.  King v. State, 29 S.W.3d 556, 562 (Tex.Crim.App.
2000); In re H.G.G.D., 310 S.W.3d at
46.  Instead, our role is to
determine whether both the explicit and implicit findings made by the trier of
fact are rational by viewing all of the evidence admitted at trial in a light
most favorable to the verdict.  Adelman v. State, 828
S.W.2d 418, 422 (Tex.Crim.App. 1992).  If the record supports conflicting inferences,
we presume that the fact finder resolved any inconsistencies in favor of the
verdict and defer to that determination.  Clayton
v. State, 235 S.W.3d 772, 778 (Tex.Crim.App. 2007);
Curry v. State, 30 S.W.3d 394, 406 (Tex.Crim.App. 2000).  The same standard of review is applicable for
both direct and circumstantial evidence cases.  Geesa v. State, 820 S.W.2d 154, 158 (Tex.Crim.App. 1991), overruled
on other grounds, Paulson v. State, 28 S.W.3d 570 (Tex.Crim.App.
2000).

Elements of Criminal Mischief and Amount of
Pecuniary Loss

A person commits
the offense of criminal mischief if, without the effective consent of the owner,
he intentionally or knowingly damages or destroys the tangible property of the
owner.  Tex.Penal Code Ann. § 28.03(a)(1)(West 2011).  A person acts intentionally when it is his
conscious objective or desire to cause the result; he acts knowingly with
respect to the nature of his conduct when he is aware that his conduct is
reasonably certain to cause the result.  Tex.Penal Code Ann. § 6.03(a), (b)(West 2011).  Proof
of a culpable mental state almost invariably depends upon circumstantial
evidence and may be inferred from any facts tending to prove its existence,
including the acts, words, and conduct of the accused.  Hart v.
State, 89 S.W.3d 61, 64 (Tex.Crim.App. 2002); see also Beltran v. State, 593 S.W.2d
688, 689 (Tex.Crim.App. 1980).

Pertinent to this
case, an offense is a felony of the third degree if the amount of the pecuniary
loss is $20,000 or more but less than $100,000. 
Tex. Penal Code Ann. § 28.03(b)(5).  If property is
destroyed, the amount of pecuniary loss is (1) the fair market value of the
property at the time and place of the destruction; or (2) if the fair market
value cannot be ascertained, the cost of replacing the property within a
reasonable time after its destruction.  Tex.Penal Code Ann. § 28.06(a)(1) and (2).  If the
property is damaged, the amount of pecuniary loss is the cost of repairing or
restoring the damaged property within a reasonable time after the damage
occurred.  Tex.Penal Code Ann. §
28.06(b).

Application 

            J.R.C.S.
first argues that there is legally insufficient evidence to support the
adjudication of delinquency.  We
disagree.

            The
State, in its petition, charged J.R.C.S. as follows: 

[O]n or about July 14, 2010, and
anterior to the presentment of this petition, in the County of El Paso, and
State of Texas, the said [J.R.C.S.], did then and there intentionally or
knowingly damage and destroy tangible property, to-wit:  a playground, to include: canopy, slides,
seesaw, cabanas, silo climber, 6 foot arch bridge, ‘S’ tube slide, 4 foot oval
crawl tube, rumble seat, sonic slide, balcony, tic-tac-toe activity wall,
accessible solar system panel, rubber chip ground cover and assorted play
stations and rock wall, by fire, without the effective consent of ANA SILVA,
the owner, and did thereby cause a pecuniary loss in the amount of $20,000 or
more but less than $100,000, in violation of Section 28.03 of the Texas Penal
Code.[1]

 

            Investigator Sodermann
testified on cross-examination the lighting of paper does not necessarily mean
that someone was trying to light something else on fire, and that he did not
see anything indicating a specific intent to burn down the playground.  However, J.R.C.S. was apprehended by Mr.
Cortez fleeing the scene of the fire and was identified by both Mr. and Mrs. Cortez.  Mrs. Cortez testified that the boys had
been filming the fire with a cell phone. 
Mr. Cortez testified that he, Mrs. Cortez, and their children were
returning from the El Paso Zoo when he saw a fire at the Ramona playground, and
asked Mrs. Cortez to dial 911.  As noted
earlier, the cell phone, which was in J.R.C.S.’s possession, contained
photographs and videos of a fire starting and growing.  There was no evidence that J.R.C.S., who was
at the scene of the fire, called 911 or otherwise reported the fire or asked
for help.  Instead, J.R.C.S. was observed
fleeing the scene.  Each of the facts
recited herein support an inference that J.R.C.S. intended to damage or destroy
the playground.  In other words, the
circumstantial evidence supports an inference that J.R.C.S. was aware that his
conduct was reasonably certain to cause the result.  See
Tex.Penal Code Ann. § 6.03(a), (b).

Viewing the
evidence in the light most favorable to the verdict, and presuming that the
fact finder resolved any inconsistencies in the evidence in favor of the
verdict, we conclude that a rational trier of fact could have found beyond a
reasonable doubt that J.R.C.S. intentionally or knowingly damaged or destroyed
the Ramona playground.  J.R.C.S.’s first issue
is overruled.

Pecuniary Loss

            In
his second and third issues, J.R.C.S. argues that the State failed to establish
the requisite pecuniary loss necessary to support the judgment and that the State
failed to prove each and every element in its petition.

            Under
the Texas Penal Code, an “owner” of property is defined as a person who “has
title to the property, possession of the property, whether lawful or not, or a
greater right to possession of the property than the actor . . . .”  Tex.Penal Code
Ann. § 1.07(a)(35)(West Supp. 2012).  This is the definition of “owner” utilized in
the jury charge in the instant case.  The
court’s instruction defined “possession” as “actual care, custody, control or
management of the property,” which is the definition of “possession” in Tex.Penal Code Ann. § 1.07(a)(39).  The Court of Criminal Appeals has recognized
that the “owner” of property may testify as to the value of the property and such
testimony has been held sufficient to determine value.  See
Sullivan v. State, 701 S.W.2d 905, 909 (Tex.Crim.App. 1986). 
In Sullivan, the Court of
Criminal Appeals held:

[W]hen the owner of the property is
testifying as to the value of the property, he or she may testify as to his or
her opinion or estimate of the value of the property in general and commonly
understood terms.  Testimony of this
nature is an offer of the witness’ best knowledge of the value of his property.
 Such testimony will constitute
sufficient evidence for the trier of fact to make a determination as to value
based on the witness’ credibility.  This
is true even in the absence of a specific statement as to ‘market value’ or ‘replacement
value.’

When an owner
testifies, the presumption must be . . . that the owner is testifying to an
estimation of the fair market value.  Certainly the owner may reasonably be
understood to be testifying as to the fair market value of the property either
in terms of the purchase price or the cost to him of replacing the stolen property.

 

Sullivan, 701 S.W.2d at 909.

 

The Court of
Criminal Appeals also held that an appellant must do more than impeach the
witness’ credibility.  To rebut an
owner’s opinion evidence, an appellant “must offer controverting evidence as to
the value of the property.”  Id.

Based on the
definition of “owner” set out in the Texas Penal Code and recited in the jury
charge, Anna Silva, the principal of Ramona Elementary, is considered an
“owner.”  Luna and Madrid could also
qualify as “owners,” since they had a greater right of possession of the
property at Ramona than J.R.C.S..  See
Lewis v. State, 628 S.W.2d 276, 279 (Tex.App.--Amarillo 1982, no pet.)(store
manager was “special owner” with greater right to possession of money than
appellant); Hudson v. State, 675
S.W.2d 507, 510 (Tex.Crim.App. 1984)(security
investigator for telephone company was “special owner” of damaged property, as
he had greater right to possession than appellant).  Their testimony regarding the value of the
property replaced at Ramona Elementary is permissible under Sullivan.

Luna and Madrid’s
testimony was that the entire playground was destroyed and had to be replaced.  On the other hand, Sodermann
stated that the canopy poles were damaged but not destroyed, allegations not
contained in the State’s petition.  In
addition to the witness testimony, Exhibits One through Eight show the destruction of the playground.  Luna testified that the bids to replace the
Ramona playground were approximately $75,000. 
Madrid testified that the cost to replace the Ramona playground was
$75,153.04.  While J.R.C.S. cross-examined
Luna, Madrid, and Silva as to depreciation of the playground equipment, he did
not present any testimony or evidence regarding the value of the Ramona
playground property.  In other words,
J.R.C.S. did not present any contravening evidence regarding the value of the
Ramona playground.  See Sullivan, 701 S.W.2d at 909.

Viewing all the
evidence in the light most favorable to the verdict, we conclude that a
rational juror could have believed the testimony and exhibits that the entire
playground was destroyed and that the pecuniary loss to YISD was greater than
$20,000 but less than $100,000.  Brooks, 323 S.W.3d at
899.  J.R.C.S.’s second issue is
overruled.

J.R.C.S. also
contends that the State did not make a distinction between property that was
“damaged” and property that was “destroyed.” 
However, the petition and jury charge in the instant case would permit
the jury to determine J.R.C.S. delinquent whether he damaged or destroyed the playground.  See
Sepulveda, 751 S.W.2d at 668.  J.R.C.S.’s argument that the State was
required to distinguish between “damaged” and “destroyed” property is without
merit, particularly in light of the testimony of Luna, Madrid, and Sodermann that the playground was destroyed.

J.R.C.S. asserts
that the State did not prove each element of the petition, specifically, that
the State failed to prove the destruction of each item described in the
petition:

[A]
playground, to include: canopy, slides, seesaw, cabanas, silo climber, 6 foot
arch bridge, ‘S’ tube slide, 4 foot oval crawl tube, rumble seat, sonic slide,
balcony, tic-tac-toe activity wall, accessible solar system panel, rubber chip
ground cover and assorted play stations and a rock wall . . . .

 

            At
trial, the State presented testimony that the destroyed playground equipment
included slides, shade structures, basic playground equipment for elementary
school children, a jungle gym, swings, poles to climb on and up, poles to swing
on, rubber chip ground cover (aka “tire media”), and shade canopies.  Photographs showing the playground equipment
before and after it was destroyed were introduced into evidence.

The Juvenile
Justice Code does not contain a specific provision governing jury charges.[2]
 In re A.A.B., 110 S.W.3d 553, 555-56 (Tex.App.--Waco
2003, no pet.).  On appeal,
juvenile delinquency proceedings are to be governed by the civil rules of
appellate procedure as far as practicable.  In re D.I.B., 988 S.W.2d 753, 756 (Tex. 1999).  However, juvenile delinquency proceedings are
quasi-criminal in nature.  In re C.O.S., 988 S.W.2d
760, 765 (Tex. 1999).  Texas Code
of Criminal Procedure article 36.14 mandates that the trial court must charge
the jury on the “law applicable to the case,” which requires that the jury be
instructed on each element of the offense charged.  Tex.Code Crim.Proc.Ann.
art. 36.14 (West 2007).  See
also Dinkins v. State, 894 S.W.2d 330, 339 (Tex.Crim.App.
1995)(because jury charge instructs jury on law
applicable to case, it must contain accurate statement of law and set out all
essential elements of offense).  The
elements of an offense are:  “the
forbidden conduct, the required culpability, any required result, nor does it
create an exception to the offense.”  Weaver v. State, 87
S.W.3d 557, 561 (Tex.Crim.App. 2002).  In criminal cases, a variance between a
charging instrument and evidence adduced at trial has been held to constitute a
legal sufficiency issue.  Gollihar v. State, 46 S.W.3d 243,
257 (Tex.Crim.App. 2001).  In juvenile proceedings, because the rules of
civil procedure govern, a fatal variance between the pleadings and proof is
determined by considering whether the variance is substantial, misleading, and
prejudicial.  Matter of O.C., 945 S.W.2d 241, 243 (Tex.App.--San Antonio 1997, no writ).

J.R.C.S. argues
that the State failed to prove damage or destruction to each item listed in the
petition.  Assuming without deciding that
there is a variance between the State’s petition and the evidence adduced at trial,
J.R.C.S. does not describe how this variance is substantial, misleading, and
prejudicial.  There is no indication in
the record that J.R.C.S. did not know what property he was accused of
destroying or damaging or that he was surprised by the proof at trial.
Moreover, J.R.C.S. does not allege that he was unable to prepare a defense
because of any alleged variance.  The
petition sufficiently alleged that J.R.C.S. damaged or destroyed property,
specifically a playground and identified the playground equipment.  J.R.C.S.’s third issue is overruled.

Disposition 

            J.R.C.S.’s
fourth and fifth issues relate to his disposition.  Essentially, he argues that the trial court
abused its discretion by assessing a disposition when J.R.C.S. was not in need
of rehabilitation, and abused its discretion when it ordered J.R.C.S.’s parents
to pay restitution.

Section 54.04 of
the Texas Family Code provides that a juvenile proceeding may consist of an
adjudication hearing and a disposition hearing.  Tex.Fam.Code
Ann. § 54.04(a)(West Supp. 2012).  At the adjudication hearing, the court or jury
must determine whether the juvenile has “engaged in delinquent conduct or
conduct indicating a need for supervision . . . .”  Tex.Fam.Code
Ann. § 54.03(a)(West Supp. 2012).  If the trial court determines that a juvenile
has engaged in delinquent conduct or conduct indicating a need for supervision,
the court conducts a separate and distinct disposition hearing subsequent to
the adjudication hearing.  Tex.Fam.Code Ann. §§ 54.03(a)
& 54.04(a).  Unless the court
or jury finds the child is in need of rehabilitation or the protection of the
public or the child requires that a disposition be made, the court must dismiss
the child and enter a final judgment without any disposition.  Tex.Fam.Code Ann. § 54.04(c).
 If the trial court finds that the child
is in need of rehabilitation or that the protection of the public or of the
child requires a disposition, it may place the child on probation.  In re J.V.M., 318 S.W.3d 444, 448 (Tex.App.--El Paso
2010, no pet.).

In a juvenile
case, the trial court possesses broad discretion to determine a suitable
disposition of a child who has been adjudicated to have engaged in delinquent
conduct.  In re A.T.M., 281 S.W.3d 67, 70 (Tex.App.--El Paso 2008, no pet.), citing In re A.S., 954
S.W.2d 855, 861 (Tex.App.--El Paso 1997, no pet.).  We do not disturb the juvenile court’s
findings absent an abuse of discretion.  In re A.T.M., 281 S.W.3d
at 70.  The juvenile court does
not abuse its discretion merely because it decides a matter differently than
the appellate court would have in a similar situation.  Id. at 71.  We apply a
two-pronged analysis to determine an abuse of discretion:  (1) did the trial court have sufficient
information upon which to exercise its discretion; and (2) did the trial court
err in its application of discretion?  Id. at 70.  A traditional sufficiency of the evidence
review helps answer the first question, and we look to
whether the trial court acted without reference to any guiding rules or
principles to answer the second.  Id.

Here, the trial
court determined that a disposition was necessary to protect J.R.C.S. and the
public.  J.R.C.S. argues that because Ms.
Salazar’s testimony indicated that J.R.C.S. was not in need of rehabilitation, the
juvenile referee abused his discretion by disregarding her testimony and
placing J.R.C.S. on supervised probation.

Ms. Salazar
testified that the recommendation of the Juvenile Probation Department was that
J.R.C.S. be placed on supervised probation with a 5 p.m. curfew until his
eighteenth birthday, because the juvenile was in need of rehabilitation.  She admitted that J.R.C.S. had no history of
drugs or alcohol abuse, and that, apart from being tardy to class five times, he was “actually doing very well” in high school.  Ms. Salazar testified that the home
evaluation indicated that the home was suitable for rehabilitation and that his
parents did not encounter any behavioral problems with J.R.C.S.  She also testified that J.R.C.S. could
benefit from cognitive skills counseling to address the poor judgment he
exercised in committing the adjudicated offense.  The PACT assessment, while indicating that J.R.C.S.
had low risk factors for possibly reoffending, stated that J.R.C.S.’s “primary
purpose for committing crime:  Excitement,
amusement, or fun.”  When asked by the
trial court why he committed the offense, J.R.C.S. responded “I was not
thinking correctly,” and “I wasn’t able to measure the consequences correctly.”
 J.R.C.S. also admitted that he did not
think of the consequences to either his family or to the children who would not
be able to use the playground.

The trial court did
not abuse its discretion by finding that J.R.C.S. was in need of rehabilitation
based on his commission of the offense, his reason for committing the offense,
and the fact that he had not yet received services to address his lack of
judgment and impulsivity.  We perceive no
abuse of discretion in the trial court’s determination that the public needed
protection from a juvenile who caused $75,000 to a school playground for
“amusement or fun.”  The court had
sufficient evidence to determine that a disposition was appropriate.[3]  J.R.C.S.’s fourth issue is overruled.

Finally, J.R.C.S.
argues that the trial court abused its discretion when it ordered his parents
to pay restitution in the amount of $25,000. 
We conclude that we have no jurisdiction over this issue.

The Texas Family
Code provides that the parents of a juvenile have their own appeal rights from
a final juvenile court order.  See Tex.Fam.Code Ann. § 61.004(a)(West 2008)(“The
parent or other eligible person against whom a final juvenile court order has
been entered may appeal as provided by law from judgments entered in civil
cases.”).  Pursuant to this section, the
parents’ appeal from a Section 54.041(b) restitution order runs independent of
the proceedings against the juvenile.  See In re D.D.H., 143 S.W.3d 906, 907 n.1 (Tex.App.--Beaumont 2004, no
pet.)(noting same).

Because a separate
Section 54.041(b) restitution order was entered against J.R.C.S.’s parents, they
were required to file their own, independent appeal of the restitution order.  See Tex.Fam.Code Ann. § 61.004(a).  A review of this case establishes that the
appeal was filed on behalf of J.R.C.S. only.[4]  His parents did not file a notice of appeal or
give any indication that they were challenging the trial court’s restitution
order.  A timely filed notice of appeal
is necessary to invoke this Court’s jurisdiction.  Tex.R.App.P. 25.1(b); Lehmann v. Har-Con
Corp., 39 S.W.3d 191, 195 (Tex. 2001).  Because no appeal was filed by J.R.C.S.’s
parents, we do not have jurisdiction over J.R.C.S’s fifth issue.[5]

CONCLUSION

Having overruled J.R.C.S.’s first four
issues and concluded that we have no jurisdiction over his fifth issue, the
judgment of the trial court is affirmed.

 

 

                                                                                                                           


December
19, 2012                                         CHRISTOPHER
ANTCLIFF, Justice

 

Before
McClure, C.J., Rivera, and Antcliff, JJ.











[1]
The petition and jury
charge require proof that J.R.C.S. did “damage and destroy” property, using the
conjunctive.  However, proof of either
“damaging” or “destroying” the property supports a conviction for criminal
mischief.  See Sepulveda v. State, 751 S.W.2d 667, 668 (Tex.App.--Corpus
Christi 1988, pet. ref’d); Adams v. State, 222 S.W.3d 37, 48 (Tex.App.--Austin
2005, pet. ref’d)(noting
same).

 





[2]
Tex. Fam.Code Ann. Title 3 (West 2008 & Supp. 2012).





[3]
However, even if the
evidence supporting such a finding is weak, Section 54.04(c) states that a
disposition can be made, if the court finds that the juvenile is in need of
rehabilitation or the protection of the public or of the child requires that a
disposition be made.  Tex.Fam.Code Ann. § 54.04(c).  Therefore, as the court found that the child
was in need of rehabilitation, it is irrelevant whether the protection of the
child or the public required a disposition. 
In re E.F.Z.R.,
250 S.W.3d 173, 178 (Tex.App.--El Paso 2008, no
pet.), citing In re S.A.M., 933
S.W.2d 744, 745 (Tex.App.--San Antonio 1996, no
pet.).

 





[4]
We note that J.R.C.S.
does not challenge the restitution order as it applies to him.  Rather, he challenges it in relation to his
parents.  See In re D.D.H., 143 S.W.3d at 907.

 





[5]
Had we concluded that J.R.C.S. had standing to address this issue on behalf of
his parents, there was no abuse of discretion. 
In its judgment of probation, the trial court made a specific finding
that J.R.C.S.’s parents "had not, by willful act or omission, contributed
to, caused, or encouraged the Child’s delinquent conduct . . . .”  However, no express finding was made that
J.R.C.S.’s parents had made a good faith effort to prevent the child from
engaging in the delinquent conduct, which would allow the restitution to be
waived.  See Tex.Fam.Code Ann. § 54.041(g).  J.R.C.S. argues that his parents “couldn’t be
more different” than the parents in In re
D.M., 191 S.W.3d 381, 384 (Tex.App.--Austin 2006,
pet. denied)(requiring restitution from parents where
juvenile caused $100,000 in damages to school due to fire, and parents blamed
school but did not recognize responsibility for juvenile’s actions), and that Ms.
Salazar testified that she did not believe they could have done anything
differently to have prevented the incident. 
However, as noted in In re D.M.,
the burden of showing a “good faith effort” to prevent the incident is not on
the State, but rests with the parents.  Id. at 388.  The record before us does not set forth
evidence to support a finding of “good faith.”  The law promotes the protection of property
owners and provides compensation for them for the wilful
and malicious destruction of their property by minors.  See In
re D.K., 247 S.W.3d 802, 804 (Tex.App.--Dallas
2008, no pet.)(upholding restitution order against juvenile’s parent, even
though parent filed affidavit of indigency, where no
evidence of inability to pay was presented at trial court and order served
purposes of protecting owner of property). 
The trial court’s ruling is more indicative of the statutory purposes of
the Juvenile Justice Code, to protect the property owners, and to provide
compensation for the destruction of the Ramona playground.  J.R.C.S. also argues that because his parents
earn less than poverty level, restitution would cause an undue hardship.  The amount of restitution ordered in the
instant case was not designed to cause hardship to J.R.C.S. or his family, but
to compensate the victim, the Ysleta Independent School District, for the
damages suffered due to the delinquent conduct.  See In
re D.K., 247 S.W.3d at 804.